# Presidential Authority Under the Trade Expansion Act to Adjust Shipments of Oil to and from Puerto Rico

Neither the uniformity of duties clause of the Constitution, Art. I, § 8, cl. 1, nor the port preference clause, Art. I, § 9, cl. 6, require uniformity of import quotas between the mainland and Puerto Rico.

The President has authority under § 232(b) of the Trade Expansion Act of 1962 to impose separate quantitative restrictions on oil imports into the U.S. mainland and Puerto Rico, respectively.

Any system of separate quotas imposed under the Trade Expansion Act must be justified by national security concerns.

By implication, § 232(b) authorizes the President to impose quotas on shipments of oil from Puerto Rico to the U.S. mainland in order to make the separate import quotas effective.

February 6, 1980

## MEMORANDUM OPINION FOR THE
## GENERAL COUNSEL, DEPARTMENT OF THE TREASURY,
## AND THE
## GENERAL COUNSEL, DEPARTMENT OF ENERGY

This responds to your request for our opinion on several questions relating to the importation of oil through Puerto Rico. Section 232(b) of the Trade Expansion Act of 1962, 19 U.S.C. § 1862(b), authorizes the President to "take such action . . . as he deems necessary to adjust the imports of [an] article . . . so that such imports will not threaten to impair the national security. . . ." The President may do so after the Secretary of the Treasury has completed an investigation and has concluded that the article "is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security. . . ." On March 14, 1979, the Secretary of the Treasury completed such a report and concluded that imports of oil and certain oil products threatened to impair the national security. *See* 44 Fed. Reg. 18818 (1979). On July 15, 1979, the President announced that he would impose an oil import quota. *See* 15 Weekly Comp. Pres. Doc. 1235 (July 23, 1979). You asked for our analysis of three questions concerning the form of that quota:

375

(1) May the President adjust shipments of oil, which are de-
rived from Puerto Rican oil imports, from Puerto Rico to
the U.S. mainland pursuant to his authority under § 232(b)
of the Trade Expansion Act?

(2) Does the answer to the first question depend on whether oil
imported into Puerto Rico is itself adjusted under the
§ 232(b) authority?

(3) If the answer to the second question is affirmative, what
kind of adjustment of Puerto Rican oil imports will suffice?
Specifically, may the adjustment involve an unrestricted
quota for imports into Puerto Rico intended for Puerto
Rican consumption with an accompanying limitation on
shipments from Puerto Rico to the U.S. mainland?

For the reasons that follow, we believe that the President may
impose a quantitative restriction on shipments of oil from Puerto Rico
to the U.S. mainland if that restriction is reasonably ancillary to a
system of import adjustments, imposed under § 232(b), that applies to
both the mainland and Puerto Rico. That system of adjustments need
not be a single quota for the entire combined territory of the mainland
and Puerto Rico; the President may impose separate quotas on Puerto
Rico and the mainland respectively. The separate quota for Puerto
Rico may be unlimited even if imports into the mainland are limited.
We believe that this is the most defensible basis for restricting ship-
ments from Puerto Rico to the mainland.[1]

## I. The President May Impose Separate Quotas on Imports into the Mainland and Puerto Rico, Respectively.

As this Office has previously concluded, the Constitution does not
prevent Congress from authorizing the President to impose separate
quotas on different regions. Section 232(b) is an exercise of Congress'
power to regulate foreign commerce. *See* U.S. Const., Art. I, § 8, cl. 3.
It is well established that regulations of commerce need not be uniform,
*see, e.g., Currin* v. *Wallace,* 306 U.S. 1, 13–14 (1939); *see also Mulford* v.
*Smith,* 307 U.S. 38, 48–49 (1939), unless some other constitutional
provision—such as the uniformity of duties clause, Art. I, § 8, cl. 1,[2] or
the port preference clause, Art. I, § 9, cl. 6[3]—requires uniformity. The

---

[1] If the President uses this approach, he will not have to interpret "imports" in § 232(b) to include
shipments from Puerto Rico to the mainland. This interpretation is questionable. There appear to be
no other statutes that explicitly define shipments from Puerto Rico to the mainland as "imports." *See,
e.g.,* 15 U.S.C. §§ 2001(10), 2052; 16 U.S.C. § 1159(f); 42 U.S.C. § 6291(a)(11). Puerto Rico is included
in the "customs territory of the United States" for tariff purposes. 19 U.S.C. § 1202 headnote 2. It is
unclear whether shipments from Puerto Rico to the mainland are "imports" for constitutional pur-
poses. *Compare Hooven & Allison Co.* v. *Evatt,* 324 U.S. 652, 668–79 (1945), *with id.* at 670 n.5 *and
Dooley* v. *United States,* 183 U.S. 151, 154–55 (1901).

[2] "[A]ll Duties, Imposts and Excises shall be uniform throughout the United States."

[3] "No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one
State over those of another."

uniformity of duties clause probably does not apply to Puerto Rico. *See Rasmussen* v. *United States,* 197 U.S. 516, 520 (1905); *Downes* v. *Bidwell,* 182 U.S. 244 (1901).[4] The port preference clause may or may not apply to Puerto Rico. *See, e.g., Secretary of Agriculture* v. *Central Roig Refining Co.,* 338 U.S. 604, 616 (1950) (a "vexing problem"); *Alaska* v. *Troy,* 258 U.S. 101, 111-12 (1922). But even if it does apply, it would not proscribe separate quotas for the mainland and Puerto Rico respectively. The net effect of separate quotas may be to benefit mainland ports at the expense of Puerto Rican ports, or vice versa, but legislation does not violate the port preference clause merely because it "greatly benefit[s] particular ports and . . . incidentally result[s] to the disadvantage of other ports. . . ." *Louisiana Public Service Commission* v. *Texas & New Orleans Railroad Co.,* 284 U.S. 125, 131 (1931). *See also Alabama Great Southern Railroad Co.* v. *United States,* 340 U.S. 216, 229 (1951).

> [T]he clause, in terms, seems to import a prohibition against some positive legislation by congress [looking to a direct privilege or preference of the ports of any particular State over those of another] . . . , and not against any incidental advantages that might possibly result from the legislation of congress upon other subjects connected with commerce, and confessedly within its power.

*Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 435 (1856). This distinction is not easy to draw, but the Supreme Court seems never to have invalidated legislation under the clause simply because it affects the prosperity of different States' ports differently. *See, e.g., Louisiana Public Service Commission* v. *Texas & New Orleans Railroad Co.,* 284 U.S. 125, 131-32 (1931). Moreover, in *Secretary of Agriculture* v. *Central Roig Refining Co.,* 338 U.S. 604, 616 (1950), the Court brushed aside the suggestion that a system of regional quotas might violate the port preference clause. *Central Roig* involved production and marketing quotas, not import quotas, but their effect was similar to the effect that might be expected from a system combining a restrictive quota on oil imports into the mainland with an unlimited quota on shipments into Puerto Rico.[5] For these reasons, this Office

---

[4] In *Downes* v. *Bidwell* the Supreme Court held that the uniformity clause applied only to the states and to those territories that have been incorporated into the United States. 182 U.S. at 251, 287. The Court has also decided that statutes that governed the status of Puerto Rico between 1900 and 1950 did not incorporate it into the United States within the meaning of *Downes. See, e.g., id.; Balzac* v. *Puerto Rico.* 258 U.S. 298, 305-13 (1922). This Office has expressed the view that statutes currently in force do not change Puerto Rico's status in this respect. But § 2 of the Foraker Act, 48 U.S.C. § 739, has an effect similar to that of the uniformity of duties clause and does limit the President's power under § 232(b).

[5] More recently, the Court has held that another clause that appears to require geographical uniformity—the bankruptcy clause, Art. I, § 8, cl. 4—permits explicit distinctions between or among regions. "The uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems." *Blanchette* v. *Connecticut General Insurance Corps. (Regional Rail Reorganization Act Cases),* 419 U.S. 102, 159 (1974); *see id.* at 160-61 (comparing uniformity requirement of bankruptcy clause with Art. I, § 8, cl. 1, the uniformity of duties clause).

has previously expressed the view that the port preference clause does not prohibit a system of regional quotas as opposed to a single overall national quota; therefore it would not proscribe separate quotas for the mainland and Puerto Rico. Thus, separate quotas seem to pose no constitutional problem.

Whether Congress has authorized the President to impose separate quotas is a more difficult question. Section 232(b) does not expressly confer such power on the President, but it does grant power in broad terms without expressly withholding the authority to impose separate quotas. As the Supreme Court has said:

> Section 232(b) authorizes the President to act after a finding by the Secretary of the Treasury that a given article is being imported "in such quantities or *under such circumstances* as to threaten to impair the national security." [Emphasis added.] The emphasized language reflects Congress' judgment that "not only the quantity of imports . . . but also the circumstances under which they are coming in: their use, their availability, their character" could endanger the national security and hence should be a potential basis for Presidential action.

*Federal Energy Administration* v. *Algonquin SNG, Inc.,* 426 U.S. 548, 561 (1976), *quoting* 104 Cong. Rec. 10542–43 (1958) (remarks of Representative Mills).

The legislative history of § 232(b) and its predecessors, moreover, makes it plain that the President was to consider the domestic effects of imports. In this respect, § 232(b) contrasts sharply with several statutes which delegate power to the President but instruct him to focus on international concerns. *See, e.g.,* 19 U.S.C. § 2132 (correcting balance of payments disequilibria); 50 U.S.C. §§ 1701–1706 (international emergency economic powers). Specifically, when Congress enacted § 232(b) it wanted the President to address himself to the effects of imports on various domestic industries that it thought were important to national security.[6] *See* § 232(c), 19 U.S.C. § 1862(c). The needs of "national security" industries may, of course, differ from region to region. A single, overall national quota might be a very crude and ineffective way of serving those needs; since Congress wanted the President to serve them, it is reasonable to suppose that Congress authorized him to use

---

[6] For example, the hearings leading up to the predecessor of § 232(b) dealt extensively with the effects imports had on industries that witnesses believed vital to the nation's security. *See Hearings on H.R. 1 ("Trade Agreements Extension") before the House Comm. on Ways and Means,* 84th Cong., 1st Sess. 178–79, 194–95, 883–85, 1000, 1006–13, 1051–54, 1266, 1308–09, 1327–28, 2118–24 (1955); *Hearings on H.R. 1 ("Trade Agreements Extension") before the Senate Comm. on Finance,* 84th Cong., 1st Sess. 113–15, 331–55, 602, 721, 878–88 (1955). The Senate Report on this provision said that "[t]he Committee believes that this amendment will provide a means for assistance to . . . various national defense industries." S. Rep. No. 232, 84th Cong., 1st Sess. 4 (1955). The Senate floor debate focused on whether § 232(b) would protect the leading industries of various Senators' states. *See, e.g.,* 101 Cong. Rec. 5297–99 (1955).

more refined methods. *See Federal Energy Administration* v. *Algonquin SNG, Inc.,* 426 U.S. 548, 561–62 (1976). Different regional quotas are one of the obvious refinements that Congress might have envisioned.

Indeed, Presidents have imposed regional quotas since they began using their § 232(b) power. In general, separate quotas were set for the area west of the Rockies, the area east of the Rockies, and Puerto Rico. *See, e.g.,* § 2 Proclamation No. 3279, 24 Fed. Reg. 1781, 1783 (1959). So far as we have been able to determine, no court has ever decided whether imposing these regional quotas exceeded the President's authority under § 232(b).[7] But Congress reenacted the provisions of § 232(b) while regional quotas were in force without specifying that the President had no power to impose them. *See, e.g.,* Trade Expansion Act of 1962, Pub. L. No. 87–794, § 232(b), 76 Stat. 872, 877 (1962), *reenacting* Trade Agreements Extension Act of 1958, Pub. L. No. 85–686, § 8, 72 Stat. 673, 678 (1958). The Supreme Court has said that such reenactments can indicate that Congress accepted the President's interpretation of the statute. *Federal Energy Administration* v. *Algonquin SNG, Inc.,* 426 U.S. 548, 570 (1976); *see, e.g., Norwegian Nitrogen Co.* v. *United States,* 288 U.S. 294, 313–15 (1933). For these reasons, we believe that § 232(b) permits the President to impose separate quotas on the mainland and Puerto Rico.

To say that § 232(b) permits separate quotas, however, is not to say that they may be imposed for any reason. Section 232(b) authorizes the President only to "take such action, and for such time, as he deems necessary to adjust the imports of [an] article . . . so that such imports will not threaten to impair the national security. . . ." Any system of separate quotas, then, must be justified by national security concerns. The March 14, 1979, findings of the Secretary of the Treasury endorse import adjustment as a way "to reduce domestic oil consumption and increase domestic production of oil and other sources of energy." 44 Fed. Reg. 18818, 18819, 18823 (1979). The legislative history of § 232(b) firmly establishes that increasing the domestic production of oil is a legitimate national security aim; recent practice, acquiesced in by the Supreme Court, suggests that reducing the consumption of oil is similarly comprised by "national security." *See Federal Energy Administration* v. *Algonquin SNG, Inc.,* 426 U.S. 548, 553–55 (1976). We understand that the reason for imposing a separate quota on Puerto Rico is that, since the island has no indigenous oil, any gains from limiting its imports will be outweighed by the risk of severe economic dislocation. We believe that this too is a suitable national security justification. Section 232(c), 19 U.S.C. § 1862(c), makes it plain that economic dislocation which results from *excessive* imports is the sort of

---

[7] In *New England Governors' Conference* v. *Morton,* Civ. No. 72-13-59 (D. Me. Sept. 7, 1973), the system of regional quotas was challenged, but the complaint was voluntarily dismissed.

impairment of the national security that the President may act to prevent:

> In the administration of this section, the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

Section 232(c), 19 U.S.C. § 1862(c). Whatever exactly the national security is,[8] there is no reason to believe that economic dislocations with this origin threaten it more than similar dislocations caused by *insufficient* amounts of imported goods. Congress' unrestrictive language—"without excluding other factors"—suggests that it would not have opposed this interpretation. Thus, if the President concludes that a strict import quota would enhance national security on the mainland but only impair it further in Puerto Rico by disrupting the island's economy, § 232(b) authorizes him to impose separate quotas. Moreover, we see nothing in § 232(b) that prohibits the President from specifying an unlimited quota for Puerto Rico, if that is what the national security demands.[9] In any event, the link between the national security and the quota system which the President finally chooses should be stated in the materials accompanying the proclamation of the quota.

We emphasize that we are discussing only the legality of separate quotas—that is, separate quantitative restrictions—for Puerto Rico and the mainland. In 1970, this Office advised the Executive Director of the Cabinet Task Force on Oil Import Control that, under § 232(b), the President cannot impose tariffs or fees on products entering Puerto Rico that differ from those he imposes on the same products entering the continental United States. We reached this conclusion on the basis

---

[8] Apparently the national security requirement of § 232(c) has never been interpreted by a court.

[9] A letter to this Office from the Deputy General Counsel of the Department of Energy asks whether the President can regulate shipments of crude oil and its derivatives from Puerto Rico to the mainland if imports of crude oil into Puerto Rico are not adjusted under § 232(b). As we have said, the most appropriate basis for regulating shipments of oil from Puerto Rico to the mainland would be that such regulation is necessary to enforce a system of import adjustments, imposed under § 232(b), that embraces both the mainland and Puerto Rico. *See* p. 2 and n.1 *supra.* But since the national security apparently would justify the President's allowing unlimited imports into Puerto Rico as a part of that system of adjustments, shipments from Puerto Rico to the mainland can be regulated even if imports of oil into Puerto Rico are in fact completely unrestricted.

of § 2 of the Foraker Act, 48 U.S.C. § 739, which provides, in part:

> The same tariffs, customs, and duties shall be levied, collected, and paid upon all articles imported into Puerto Rico from ports other than those of the United States which are required by law to be collected upon articles imported into the United States from foreign countries.

We concluded that this specific prohibition limited the President's powers under § 232(b). Similar problems may arise if the President imposes a license fee or "tariff quota" system in which imports can enter free-of-charge up to a certain level but must pay a tariff or fee beyond that level; if the level from which duties are charged is not the same for both the mainland and Puerto Rico, we would have considerable doubt about the ability of the program to survive a challenge in court.[10]

## II. The President May Impose Quotas on Shipments of Oil from Puerto Rico to the Mainland as a Necessary Incident of a System of Separate Import Quotas.

Shipments of oil between regions can, of course, nullify any system of regional quotas. Sometimes, market conditions and transportation costs combine to prevent such transshipments. If they do not, however, and if § 232(b) gives the President the power to establish separate regional quotas, then by implication § 232(b) authorizes the President to restrict transshipments directly in order to make the separate regional quotas effective. The Supreme Court is, "in the absence of compelling evidence that such was Congress' intention, unwilling to prohibit administrative action imperative for the achievement of an agency's ultimate purposes. . . . We cannot . . . conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purposes for which it has acted." *Permian Basin Area Rate Cases,* 390 U.S. 747, 780, 777 (1968). Elsewhere the Court has indicated that unless Congress says otherwise, an agency has power to do that which is "reasonably ancillary to the effective performance of [its] various responsibilities. . . ." *United States* v. *Southwestern Cable Co.,* 392 U.S. 157, 178 (1968). Neither the text nor the legislative history of § 232(b) suggests that Congress intended to withhold from the President all authority to regulate shipments between regions. The President may, then, impose 'quotas on shipments of oil from Puerto Rico to the mainland if he decides that such quotas are reasonably necessary to enforce the import adjustment scheme he has adopted under § 232(b).[11]

---

[10] The Supreme Court recently declined to decide the analogous issue arising under the uniformity of duties clause. *See Federal Energy Administration* v. *Algonquin SNG, Inc.,* 426 U.S. 548, 560 n.11 (1976).

[11] In *Gulf Oil Corp.* v. *Hickel,* 435 F.2d 440 (D.C. Cir. 1970), the United States Court of Appeals for the District of Columbia Circuit tacitly endorsed the President's power to restrict shipments of oil from Puerto Rico to the mainland. In 1968 a presidential proclamation under § 232(b) imposed

Continued

It is not difficult to see why restrictions on transshipments will be necessary if Puerto Rico's quota is unlimited and the mainland's has some significant effect on imports. Nonetheless, it would be advisable for the President to explain his reasoning if and when he adopts such restrictions. Moreover, we wish to emphasize that § 232(b) authorizes only those controls on interstate shipments which are reasonably ancillary to a system of import adjustments adopted under § 232(b). Section 232(b) does not give the President a general power to adjust interstate shipments of oil.

Again, our conclusions apply only to quotas or other quantitative restrictions on shipments from Puerto Rico to the mainland. A tariff or fee would violate § 3 of the Foraker Act, 48 U.S.C. § 738:

> All merchandise and articles coming into the United States from Puerto Rico and coming into Puerto Rico from the United States shall be entered at the several ports of entry free of duty and in no event shall any tariff duties be collected on said merchandise or articles.

*See also Dooley* v. *United States,* 182 U.S. 222, 233–36 (1901). As we said in connection with § 2 of the Foraker Act, 48 U.S.C. § 739, this specific prohibition limits the President's general § 232(b) powers.

LARRY A. HAMMOND
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

separate quotas on oil shipped into the mainland and Puerto Rico. *See* Proclamation No. 3823, 33 Fed. Reg. 1171 (1968), *amending* Proclamation No. 3279, 24 Fed. Reg. 1781 (1959). The Puerto Rican quota was allocated among several producers. Section 3(b)(2) of the proclamation instructed the Secretary of the Interior that if a producer shipped more oil from Puerto Rico to the mainland than that producer had shipped during a certain base year, the producer's allocated share of the Puerto Rican import quota for the next year was to be reduced by an equal amount. The obvious purpose and effect of this provision was to ensure that shipments of oil from Puerto Rico to the mainland would not exceed the base year levels. The District of Columbia Circuit noted that this provision was "in furtherance of the large design of the overall regulatory scheme, to restrict importation of foreign oil into the *continental* United States." *Id.* at 443 (emphasis added). The court proceeded to decide a dispute, arising under this provision, about how to calculate the base year figure. The legality of the restriction on shipments from Puerto Rico to the mainland was apparently not challenged, and the court never questioned it.