**INDEPENDENT GASOLINE MARKETERS COUNCIL, INC., et al., Plaintiffs,**

v.

**Charles W. DUNCAN, Jr., Secretary, Department of Energy, et al., Defendants.**

**MARATHON OIL CORPORATION, Plaintiff,**

v.

**James Earl CARTER, President of the United States, et al., Defendants.**

Civ. A. Nos. 80–1116, 80–1181.

United States District Court, District of Columbia.

May 13, 1980.

As Amended May 14, 1980.

Jack A. Blum, Edward G. Modell, Ronald L. Plesser, William F. Fox, Jr., Seyfarth, Shaw, Fairweather & Geraldson, Washington, D. C., for Independent Gasoline Marketers Council, Inc.

Patrick F. McCartan, Cleveland, Ohio, for Marathon Oil Corp.

William Elliott, Dept. of Justice, Civ. Div., Washington, D. C., for defendants.

MEMORANDUM OPINION AND ORDER

AUBREY E. ROBINSON, Jr., District Judge.

In these consolidated actions Plaintiffs Independent Gasoline Marketers Council, Inc. *et al.*, and Marathon Oil Corporation, seek to enjoin the defendants [1] from implementing or enforcing the Petroleum Import Adjustment Program ("PIAP" or "the Program") proclaimed by the President of the United States in Proclamation 4744 (45 *Fed.Reg.* 22864; April 3, 1980), as amended by Proclamation 4748 (45 *Fed.Reg.* 25371; April 15, 1980) and Proclamation 4751 (45 *Fed.Reg.* 27905; April 25, 1980). This Program was created as a result of the report to the President on March 14, 1979, by the Treasury Secretary, acting pursuant to Section 232(b) of the Trade Expansion Act of 1962 as amended (TEA), that oil was being imported into the United States "in such quantities and under such circumstances as to threaten to impair the national security." 44 *Fed.Reg.* 18818 (March 29, 1979). The investigation upon which this determination was founded had been initiated on March 15, 1978, by W. Michael Blumenthal, former Secretary of the Treasury, in the exercise of his authority under Section 232. Information and advice were solicited from the Secretary of Defense, the Secretary of Energy, the Secretary of State, the Secretary of Commerce, the Federal Reserve Board, the Central Intelligence Agency and other appropriate officers of the United States regarding the effects on national security of the imports of petroleum and petroleum products. Those matters specified in Section 232(c) of the TEA and other relevant factors were considered.

The Treasury Secretary found that the level of imported oil threatened our national security. He recommended that President Carter take action. The President's response was the enactment of the PIAP, which was implemented primarily to lower domestic gasoline consumption by raising the retail price of all gasoline by $.10 per gallon. Its mechanism may be summarized as follows:

Under the PIAP, a license fee would be imposed on imported crude oil and gasoline. The amount of the fee (presently estimated at $4.62 per barrel of crude oil and $4.35 per barrel of gasoline) would float, and would be determined by the effect of the fee on the retail price of gasoline. The PIAP would be terminated if and when Congress increases the present $.04 per gallon excise tax to $.14 per gallon. [2]

The initial cost of the fee would be borne by importers. In the case of crude oil, importers would be fully reimbursed for the payment of the fee through the PIAP's entitlement program. That mechanism would require domestic gasoline refiners to purchase entitlements from importers; the price of the entitlements would vary monthly to insure full reimbursement. PIAP further provides that all costs incurred from the conservation fee may be passed through the chain of distribution. At the refiner level the nature of the fee changes, however. Instead of remaining solely on imported oil, the PIAP provides that the cost of the fee is to be borne by jobbers, and then consumers, of both domestic and imported gasoline.

In economic terms, the PIAP may best be viewed as a demand-side disincentive. [3] The

---

1. The defendants named in this action are the President of the United States, the Secretary of the Department of Energy ("Energy Secretary") and the Department of Energy ("DOE"), the Secretary of Commerce ("Commerce Secretary") and the Department of Commerce ("Commerce Department"), the Secretary of the Department of the Treasury ("Treasury Secretary") and the Department of the Treasury ("Treasury Department"), and the Treasurer of the United States ("Treasurer").

2. *Id.; See also White House Fact Sheet on the Gasoline Conservation Fee* (April 2, 1980), and *Text of the President's Address on Economic Policy* (March 14, 1980).

3. A demand-side disincentive lowers demand for a given good by artificially raising its price. A supply-side disincentive (such as a quota) decreases the availability of a given good. The Supreme Court has referred to demand-side disincentives as "monetary measures," and supply-side disincentives as "quantitative measures." *See FEA v. Algonquin*, 426 U.S.

Program would initially attempt to curb demand for imported oil and gasoline in a judicially approved manner. *See FEA v. Algonquin SNG*, note 3, *supra.* The PIAP mechanism completely undermines this demand-side disincentive, however, by contemplating that the cost of the fee would eventually be paid by consumers of both domestic and imported gasoline. Thus, the imposition of the fee would not put imported oil at a competitive disadvantage with domestic oil, and the demand for imported oil would not decrease proportionately to domestic oil. Rather, the specific demand-side disincentive initially placed on imported oil is, under the PIAP, transformed into a generalized demand-side disincentive on the purchase of all gasoline.[4]

Because of the displacement of the initial import fee onto both domestic and imported oil, and the nature of the fee itself, the PIAP could not act as a disincentive to reduce imports. As was noted earlier, the amount of the conservation fee would float, depending on the cost necessary to effectuate a $.10 per gallon increase at the retail level. In January of 1980, 6,122,000 barrels of oil were imported into the United States. If the PIAP had been in effect in January of 1980, the import fee would have been $4.79 per barrel. Assuming that domestic production remained constant and imports increased to 6,783,000 barrels per day, the import fee would *decrease* by more than ten percent. Likewise, assuming that domestic production remained constant and imports decreased to 6,022,000 barrels per day, the import fee would *increase* by two percent. Thus, the PIAP would result in increased fees as importation of oil decreases, and decreased fees, should the amount of imported oil increase. Rather than attempt to directly decrease the amount of oil imported into the United States, the PIAP attempts to decrease the total amount of oil consumed, and therefore could have only a

collateral effect on the retailing of foreign oil.

Under Section 232 of the Trade Expansion Act, 19 U.S.C. § 1862(b), if the Secretary of Commerce[5] has found after an appropriate investigation that imports of an article "threaten to impair the national security," the President is authorized to "take such action, and for such time, as he deems necessary to adjust the imports of such article" so as to lessen the threat to national security. Defendants argue that the TEA standing alone authorizes the Petroleum Import Adjustment Program. They contend first that Section 232 empowers the President to impose license fees as he has done in the PIAP. They argue further that the TEA gives the President authority to channel the impact of that fee to gasoline sales because doing so will (a) enable the program to have the desired effect on imports and (b) equitably distribute the burden of the program throughout the nation.

In *FEA v. Algonquin, SNG, Inc.*, 426 U.S. 548, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976), the Supreme Court held that Section 232 authorizes the President to impose a system of license fees as a means of controlling imports. In that case, respondents had argued that the section empowers the President to control imports only by imposing "direct" controls such as quotas and not through the use of license fees. In holding to the contrary, the Court found that the statute authorizes not only quantitative restraints that affect the supply of imported goods, but also monetary measures, such as license fees, that control imports by affecting demand. The Court noted that a license fee itself "as much as a quota has its initial and direct impact on imports, albeit on their price as opposed to their quantity." *Id.*, at 571, 96 S.Ct. at 2307. Although concluding that the statute authorizes a

---

548, 561, 96 S.Ct. 2295, 2303, 49 L.Ed.2d 49 (1976).

4. Defendants estimate that the PIAP would reduce overall gasoline consumption by 56,000 to 100,000 barrels per day.

5. Prior to January 2, 1980, investigatory responsibility under the TEA vested in the Secretary of the Treasury. *See* Exec. Order No. 12175, 44 Fed.Reg. 70703 (Dec. 10, 1979); Reorganization Plan No. 3 of 1979, 44 Fed.Reg. 69273 (Dec. 3, 1979).

license fee, the Court cautioned that its conclusion does not mean that "*any* action the President might take, as long as it has even a remote impact on imports, is also so authorized." *Id.* (emphasis in original).

*Algonquin* is not dispositive of the instant action. The import fee approved by the Supreme Court in that case directly affected the price of imported oil relative to domestic oil. Standing alone, the import fee component of the PIAP would have a similar effect. In the context of the PIAP mechanism as a whole, however, the import fee has no "initial and direct impact on imports" similar to that of the fee approved in *Algonquin*. Nor is it intended to have such a result. The purpose and effect of the entitlements component of the PIAP mechanism is to neutralize the "initial and direct impact" that the fee standing alone would have on oil imports. Under the system as outlined above, the $.10 per gallon conservation fee imposed on all gasoline is used to offset the initial import fee in its entirety. No monetary burden is imposed on imported oil that is not imposed on domestic oil. Thus the effect of the PIAP is to impose a $.10 per gallon conservation fee on all gasoline sales. Any impact on imports will be indirect and will result from the general gasoline conservation fee, not from the initial import fee.

■ To determine whether the Trade Expansion Act authorizes the PIAP, the Court must look to the design of the program as a whole. Analysis of the manner in which PIAP would function belies Defendants' contention that it is structured to lower demand for imported oil in particular rather than demand for oil generally. Two aspects of the program undercut Defendants' argument. First, as discussed above, the initial import fee is completely offset by the entitlements mechanism. Second, assuming a stable level of domestic oil production, the . per barrel import fee would decrease if the level of imports rose.[6] The rationale underlying PIAP thus reduces to the contention that TEA empowers the President to im-

pose a $.10 per gallon "conservation fee" on all gasoline so as to lower demand for the product. The TEA provides no such authority.

■ TEA does not authorize the President to impose general controls on domestically produced goods either through a monetary mechanism or through a quantitative device. The statute provides for regulation of imports. A regulation on imports may incidentally regulate domestic goods. The regulation of domestic oil contemplated by PIAP, however, is not incidental to regulation of imported oil. Rather, it is a primary purpose of the program, and is essential to the goal of reducing demand for all gasoline regardless of its source. Moreover, the impact of the oil conservation fee is greater on domestically produced oil than on imported oil since the former comprises roughly sixty (60) per cent of all crude oil utilized today, and Defendants acknowledge that the PIAP's effect on import levels will be slight.

In *Algonquin*, the Supreme Court indicated that TEA does not authorize "any action the President might take, as long as it has even a remote impact on imports." Any possible benefits of the PIAP on levels of oil imports are far too remote and indirect for the TEA alone to support the program. The remoteness of the program's effect on imports is apparent from three factors. First, the quantitative impact of the program on import levels will admittedly be slight. Second, the program imposes broad controls on domestic goods to achieve that slight impact. Third, Congress has thus far denied the President authority to reduce gasoline consumption through a gasoline conservation levy.[7] PIAP is an attempt to circumvent that stumbling block in the guise of an import control measure. TEA alone does not sanction this attempt to exercise authority that has been deliberately withheld from the President by the Congress.

The Government asserts that, even if the TEA does not provide authority for the

6. *See* p. 617, supra.

7. *See* p. 620 *infra.*

entitlements portion of the PIAP, Presidential authority for that portion of the Program may be derived from the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. § 751, *et seq.* Thus, it is alleged that the TEA permits the imposition of the import fee,[8] and the EPAA authorizes the entitlement program. While the Court has doubts about the applicability of the EPAA in the instant litigation, it need not rule on this matter because of noncompliance with the procedural requirements of the statute.

Section 5 of the EPAA provides that: Sections 205 through 207 and sections 209 through 211 of the Economic Stabilization Act of 1970 [(ESA)] . . . shall apply . . . to any order under this Chapter and to *any action taken by the President* (or his delegate) under this Chapter as if . . . such action had been taken under the Economic Stabilization Act of 1970 . . .

15 U.S.C. § 754(a)(1) (emphasis added). Section 207 of the ESA, 12 U.S.C. § 1904 note, states that

(a) The functions exercised under this title are excluded from [the Administrative Procedure Act] except as to the requirements of sections 552, 553, and 555(e) of Title 5 . . .

(c) To the maximum extent possible, the President or his delegate shall conduct formal hearings for the purpose of hearing arguments or acquiring information bearing on a change or proposed change in . . . prices . . . which have or may have a significantly large impact upon the national economy . .

Section 553 of the Administrative Procedure Act (APA) establishes rule making procedures. It provides for, *inter alia,* notice of proposed rule making, 5 U.S.C. § 553(b), the opportunity for interested parties to participate in the rule making, 5 U.S.C. § 553(c), and publication or service of a substantive rule at least thirty days before its effective date, 5 U.S.C. § 553(d).

The Government supports its assertion by stating that (1) the President is not an "agency" within the meaning of the APA and (2) when Congress enacted Section 207 of the ESA, the President had already delegated his authority under the ESA to the Cost of Living Council, and thus Section 207 imposed no procedural responsibility on the President. The Government contends further that separation of powers principles compel a conclusion that the EPAA imposes no procedural requirements on the President.

 The Government's reliance on the definition of "agency" in the APA and the legislative history of the ESA is misplaced. The Court need not scrutinize either of those statutes in the instant case to ascertain to whom their procedural requirements apply. Rather, the Court must only look at the principle statute in question, the EPAA. That statute states, in no uncertain terms, that Section 207 of the ESA and Section 553 of the APA apply to *any action taken by the President.* Thus, a condition precedent to the exercise of authority granted by the EPAA is compliance with those sections of the ESA and APA. The President can derive no authority for the gasoline conservation fee from the EPAA.[9]

 Defendants finally contend that, because of the national security aspects presented by this nation's consumption of imported oil, the President has authority, independent of Congress, to impose a gasoline conservation fee. The extent of the "inherent" nature of Presidential power was delineated by the Supreme Court in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). The Court stated that

**8.** The President has the authority to impose an import fee pursuant to the TEA. *See FEA v. Algonquin SNG, supra.*

**9.** Defendants' contention that separation of powers principles preclude the application of procedural safeguards in the instant case is tenuous indeed. Congress has the power to impose reasonable safeguards on Presidential action if that action is contingent on a delegation of authority from Congress. In fact, such safeguards may be necessary to preclude the unlawful delegation of power by Congress. *See FEA v. Algonquin SNG, supra,* 426 U.S. at 559–560, 96 S.Ct. at 2302.

In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make the laws which the President is to execute. The first section of the first article.says that "All legislative Powers herein granted shall be vested in a Congress of the United States . . . ."
. . . Article I goes on to provide that Congress may "make all laws which shall be necessary and proper for carrying into Execution the foregoing Powers . . . ."

*Id.*, at 587–588, 72 S.Ct. at 867. It is clear that Congress, not the President, must decide whether the imposition of a gasoline conservation fee is good policy.

■ On this issue, Congress has already spoken. The Energy Policy and Conservation Act, (EPCA) 42 U.S.C. § 6201, *et seq.*, gives the President the authority to prescribe a "plan which imposes reasonable restrictions on the public or private use of energy which are necessary to reduce energy consumption." 42 U.S.C. § 6262(a)(1). Section 202 of that Act provides that

(2) An energy conservation contingency plan under this section may not—

(A) impose rationing or any tax, tariff, or user fee;

(B) contain any provision respecting the price of petroleum products . . .

42 U.S.C. § 6262(a)(2). Congress has thus precluded the use of demand-side disincentives to lower overall gasoline consumption.[10] It is imperative to note that the EPCA is not effective until the President has found the existence of a severe energy supply interruption. 42 U.S.C. § 6261(b). Thus, even in times of severe energy supply

interruptions, the President may not use monetary measures to decrease demand. The imposition of the gasoline conservation fee is contrary to manifest Congressional intent.

■ This Court cannot, should not, and does not question the determination of the President that, given the extent of United States dependence on foreign oil, any significant interruption of imported oil could have severe consequences for national security. The President's determination that the level of oil imports, coupled with the unprecedented increase in oil prices has had a dramatic impact on the economic well-being of the United States, is also not questioned by this Court. What is required of the Court, a duty the Court does not shirk, is to determine whether the President's action falls within the relevant statutory authority granted him by the Congress of the United States. In making that determination, clear expressions of statutory purposes cannot be ignored, laudable purposes notwithstanding. Existing statutes cannot be used for purposes never contemplated by Congress and in ways contrary to congressional intent.

Any doubts concerning this proposition were laid to rest by the Supreme Court of the United States in *Youngstown Sheet & Tube Co. v. Sawyer, supra.* The Court was confronted with a similar argument by the Government to justify seizures of steel plants pursuant to executive order in the face of an impending strike which threatened severe economic consequences and our national security. The Court struck down the order because:

[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President.

*Id.*, at 588, 72 S.Ct. at 867.

The gasoline conservation fee at issue in the instant litigation does not fall within

---

10. In commenting on an original executive proposal rejected in the version passed by the Congress, the House Report to the EPCA stated that "the Committee finds the President's strategy to use price as the principal means of

achieving conservation unacceptable because it so harshly impacts on the poor and low income members of our society." H.R.Rep. No. 94–340, 94th Cong., 1st Sess. 6 (1975), U.S.Code Cong. & Admin.News 1975, pp. 1762, 1768.

the inherent powers of the President, is not sanctioned by the statutes cited by Defendants, and is contrary to manifest Congressional intent. The Court has no choice but to grant Plaintiffs the relief they seek.

Accordingly, it is by the Court this 13th day of May, 1980,

DECLARED, that the Petroleum Import Adjustment Program is unlawful; and it is

ORDERED, that Defendants, their agents, employees, successors, attorneys and all those in active concert or participation with them be, and they hereby are, enjoined from implementing or otherwise giving effect to the Petroleum Import Adjustment Program set forth in Proclamation 4744 (45 *Fed.Reg.* 22864; April 3, 1980), as amended by Proclamations 4748 (45 *Fed.Reg.* 26371, April 15, 1980) and 4751 (45 *Fed.Reg.* 27905; April 25, 1980).

Consolidation of the hearing on the application for preliminary relief with trial on the merits having been ordered by the Court on May 12, 1980, the foregoing constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of F.R.Civ.P.