# The President's Power to Impose a Fee on Imported Oil Pursuant to the Trade Expansion Act of 1962

The President has authority under § 232(b) of the Trade Expansion Act of 1962 to impose a license fee directly on foreign oil in order to restrict its importation in the interest of national security. However, the case law casts doubt on the President's authority to act under § 232(b) when the impact of his action falls only remotely and indirectly on imported articles, as was the case when President Carter sought in 1980 to implement a program designed primarily to restrict domestic consumption of gasoline.

Prior to imposing a license fee on oil imports under § 232(b), the President is required to make certain findings, based on an investigation by the Secretary of Commerce, relating to the effects on the national security of oil imports, and to issue a proclamation.

January 14, 1982

## MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

You have asked this Office to provide you with a preliminary and summary review concerning the President's authority under § 232(b) of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862 (1976 ed. & Supp. IV 1980), to impose a fee on imported oil. Specifically, you have asked whether such authority can be exercised under that section of the Act and, if so, the proper procedures by which it can be invoked. Based upon our preliminary analysis, we are of the view that the President has such authority and may exercise it by presidential proclamation based upon certain findings.

### A. The Statute

Section 232(b) of the Act provides that if the Secretary of Commerce[1] finds that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," the President is authorized to

> take such action, and for such time, as he deems necessary to adjust the imports of [the] article and its derivatives so that . . . imports [of the article] will not so threaten to impair the national security.

---

[1] This responsibility was transferred to the Secretary of Commerce from the Secretary of the Treasury pursuant to § 5(a)(1)(B) of Reorganization Plan No 3 of 1979, 3 C.F.R. 513 (1979 Comp ).

74

The Secretary, upon his own motion or at the request of the head of any department or agency, is directed by this section to make an "appropriate investigation" in the course of which he must consult with the Secretary of Defense and "other appropriate officers of the United States" to determine the effects on the national security of imports of the subject article. The Secretary is further instructed that "if it is appropriate," he shall give reasonable notice, hold public hearings, and otherwise give interested parties an opportunity to present information and advice relevant to his investigation.

Section 232(c) of the Act provides the President and the Secretary with guidance as to some of the factors to be considered in implementing § 232(b). "[W]ithout excluding other relevant factors," this section directs the Secretary and the President to consider such factors as domestic production of the article necessary for national defense needs, the capacity of domestic industries to meet such requirements, and, generally, the availability of materials and services necessary to meet national security requirements. This section further provides:

> In the administration of this section, the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from displacement of any domestic products by excessive imports shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

Power under § 232(b) and its predecessors[2] has frequently been exercised in the context of presidential proclamations designed to restrict the importation of petroleum and petroleum products. Thus in 1959 President Eisenhower, having been advised that crude oil products were being imported in such quantities and under such circumstances as to threaten the national security, imposed a system of quotas on the importation of petroleum and petroleum products. Presidential Proclamation No. 3279, 3 C.F.R. 11 (1959–1963 Comp.). Thereafter, Presidents Kennedy, Johnson, and Nixon each amended the quota program by raising the permissible quota levels. *See* proclamations cited at 19 U.S.C. § 1862 note.

## B. Authority to Impose Import Fees

The authority of the President to impose a fee on imported oil pursuant to the Act was upheld by the Supreme Court in *Federal Energy Administration* v. *Algonquin SNG, Inc.,* 426 U.S. 548 (1976). In that case, the Secretary of the

---

[2] Section 232(b) was originally enacted by Congress as § 7 of the Trade Agreements Extension Act of 1955, ch 169, 69 Stat. 162, 166, and amended by § 8 of the Trade Agreement Extension Act of 1958, Pub. L. No. 85-686, 72 Stat 673, 678.

Treasury, acting pursuant to § 232(b), had initiated an investigation "to determine the effects on the national security of imports of petroleum and petroleum products." *Id.* at 553. Although § 232(b) directs the Secretary "if it is appropriate [to] hold public hearings or otherwise afford interested parties an opportunity to present information and advice" as part of such an investigation, the Secretary found that such procedures would interfere with "national security interests" and were "inappropriate" in this case. *Id.* at 554. The investigation therefore proceeded without any public hearings or submissions from interested non-governmental parties. *Id.*[3]

On January 14, 1975, ten days after the Secretary initiated his investigation, he reported to President Ford that prior measures under § 232(b) had not solved the problem of the Nation's dependence on foreign oil and concluded

> crude oil . . . and related products . . . are being imported into the United States in such quantities . . . [and] under such circumstances as to threaten to impair the national security.

426 U.S. at 554.

On the basis of these findings, the President issued a proclamation on January 23, 1975, which, *inter alia,* imposed a "supplemental fee" on all imported oil. Presidential Proclamation No. 4341, 3 C.F.R. 431 (1971–1975 Comp.). The fee was initially $1 per barrel for oil entering the United States on or after February 1, 1975, but was scheduled to be raised to $2 per barrel for oil entering after March 1, 1975, and to $3 per barrel for oil entering after April 1, 1975.

Four days after Proclamation No. 4341 was issued it was challenged by eight states, 10 utility companies, and a Congressman in the United States District Court for the District of Columbia, who alleged that the imposition of the fees was beyond the President's constitutional and statutory authority, and that the fees were imposed without the necessary procedural steps having been taken. The district court ruled that § 232(b) was a valid delegation to the President of the power to impose license fees on oil imports, and that the procedures followed by the Secretary in imposing the fees had fully conformed to the requirements of the statute. The Court of Appeals for the District of Columbia Circuit reversed, holding that § 232(b) did not authorize the President to impose a license fee scheme as a method for adjusting imports because, in its view, the Act authorized only the use of "direct" controls, such as quotas, and did not encompass license fees. The Supreme Court, in turn, reversed the court of appeals, holding that § 232(b) authorized the implementation of import fees and stating:

---

[3] The Secretary had solicited the views of the Attorney General on this subject. In an opinion dated January 14, 1975, the Attorney General determined that, under the statute and Treasury Regulations, the public notice and comment provisions could be "varied or dispensed with in emergency situations or when, in [the Secretary's] judgment, national security interests require. . . ." Opinion of Attorney General William B Saxbe, 43 Op Att'y Gen No. 3 (Jan. 14, 1975) at 4. This opinion was also based in part on the fact that the Secretary proposed to follow the pattern of regulating oil imports by amending Proclamation No 3279, 3 C FR. 11 (1959–1963 Comp ). The findings of that original proclamation had, by that time, "been sanctioned by Congress' failure to object to the President's proceeding on that basis repeatedly during the past 15 years" to counter the threat of oil imports. Because Proclamation No 3279 already had "been amended at least 26 times since its issuance in 1959," *id.* at 3, citing 19 U S C § 1862 note, the Attorney General concluded that no new findings were necessary.

Taken as a whole then, the legislative history of § 232(b) belies any suggestion that Congress, despite its use of broad language in the statute itself, intended to limit the President's authority to the imposition of quotas and to bar the President from imposing a license fee system like the one challenged here. To the contrary, the provision's original enactment, and its subsequent reenactment in 1958, 1962, and 1974 in the face of repeated expressions from Members of Congress and the Executive Branch as to their broad understanding of its language, all lead to the conclusion that § 232(b) does in fact authorize the actions of the President challenged here. Accordingly, the judgment of the Court of Appeals to the contrary cannot stand.

426 U.S. at 570–71.

Although the Court upheld the President's power under § 232(b) to affect the price of imports, as well as their quantity, its opinion ended on a note of caution, stating as follows:

A final word is in order. Our holding today is a limited one. As respondents themselves acknowledge, a license fee as much as a quota has its *initial and direct impact on imports,* albeit on their price as opposed to their quantity. Brief for Respondents 26. As a consequence, our conclusion here, fully supported by the relevant legislative history, that the imposition of a license fee is authorized by § 232(b) in no way compels the further conclusion that *any* action the President might take, as long as it has even a remote impact on imports, is also so authorized.

426 U.S. at 571 (emphasis added).

## C. "Indirect" Import Restrictions

In 1980, President Carter sought to use his authority under the Act in conjunction with authority derived from the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751–760a (1976 ed. & Supp. IV 1980), to implement a program designed to decrease domestic consumption of gasoline. Presidential Proclamation No. 4744, 3 C.F.R. 38 (1980 Comp.). Although styled as a "petroleum import adjustment program," the program was intended and designed "to ensure that the burden of the crude oil fee [fell] on gasoline," and not on such products as home heating oil. This was accomplished through imposition of a "gasoline conservation fee" which applied irrespective of whether the gasoline was refined from domestic or imported crude oil.

The decision to impose the fee on gasoline proceeded after the requisite investigation and finding by the Secretary of the Treasury that oil imports were entering the country "in such quantities and under such circumstances as to threaten to impair the national security." 44 Fed. Reg. 18818 (1979).

This Office was consulted about the proposed fee in January 1980. Memoranda memorializing conversations with Department of Energy and Office of Management and Budget officials expressed concerns that the Act, by itself, could not authorize imposition of a system for allocating to domestic producers of gasoline a tax on foreign crude. Although we recognized that the President clearly had power to adjust imports under § 232(b) by establishing quotas or affecting import prices, we also noted that the Supreme Court's language in the *Algonquin* decision had distinguished between import fees, which have an "initial and direct impact" on imports, and actions with only "a remote impact on imports." Based on this decision and on the legislative history of the Act, we questioned that the President's powers under § 232(b) encompassed measures that applied indirectly to the imported article itself. These doubts notwithstanding, this Office eventually approved the final version of Proclamation No. 4744 as to form and legality. As noted, that version relied for the President's authority not only on § 232(b) of the Act but also on provisions of the Emergency Petroleum Allocation Act of 1973.

The Petroleum Import Adjustment Program (PIAP), set in place by Proclamation No. 4744, was challenged in court on the ground that in imposing it the President had exceeded his authority under the Act. *Independent Gasoline Marketers Council, Inc. v. Duncan*, 492 F. Supp. 614 (D.D.C. 1980). After an extended discussion of the mechanics of PIAP, the intent behind it and its predictable impact, the district court, focusing on the Supreme Court's warning in *Algonquin* held:

> In *Algonquin*, the Supreme Court indicated that TEA [Trade Expansion Act] does not authorize "any action the President might take, as long as it has even a remote impact on imports." Any possible benefits of the PIAP on levels of oil imports are far too remote and indirect for the TEA alone to support the program. The remoteness of the program's effect on imports is apparent from three factors. First, the quantitative impact of the program on import levels will admittedly be slight. Second, the program imposes broad controls on domestic goods to achieve that slight impact. Third, Congress has thus far denied the President authority to reduce gasoline consumption through a gasoline conservation levy. PIAP is an attempt to circumvent that stumbling block in the guise of an import control measure. TEA alone does not sanction this attempt to exercise authority that has been deliberately withheld from the President by the Congress.

492 F. Supp. at 618 (footnote omitted).[4]

Subsequent to the district court's decision in *Independent Gasoline Marketers Council, Inc. v. Duncan, supra,* Congress terminated PIAP by legislation passed

---

[4] The government also argued that the President's authority could be derived from the Emergency Petroleum Allocation Act, 15 U S C. §§ 751–760a The court rejected this argument on the ground that the President had not complied with procedures required by that Act *Id* at 619

over the President's veto. Pub. L. No. 96-264, § 2, 94 Stat. 439. This foreclosed substantive appellate action in the case.

### D. Conclusion

On the basis of the *Algonquin* decision it is clear that the President has authority under § 232(b) to impose a direct fee on imported oil. Both the cautionary language in *Algonquin*, and the district court's decision in the *Independent Gasoline Marketers Council* case indicate, however, that his authority may be limited to the power to impose fees directly on imported articles. 426 U.S. 548, 571; 492 F. Supp. 614, 618–19. The President's authority to act pursuant to that section becomes increasingly suspect as the impact of his action falls less directly on the imported articles and increasingly affects domestic products. This interpretation is also supported by the legislative history of § 232(b).

Based on the *Algonquin* case, we are confident that a $2 per barrel import fee on imported oil could be imposed by the President pursuant to his authority under the Act, provided it applied solely to imported petroleum or petroleum products. This fee could be imposed by a presidential proclamation similar to Proclamation No. 4341 of President Ford, *supra*. The proclamation could also specify which agency would be responsible for its implementation.[5]

The 1975 Opinion of Attorney General Saxbe advising the Secretary of the Treasury with respect to the necessary procedures for imposing an import fee under § 232(b) stated alternatively (a) that the Secretary would be justified in following his own regulations in deciding that an emergency situation existed such that notice and hearings would be "inappropriate"[6] were he to conduct an investigation, and (b) that an investigation and further finding with respect to the impact of oil imports on the national security were unnecessary, at least in the context of a proposed amendment to the series of programs that had been in existence since President Eisenhower issued Proclamation No. 3279 in 1959.

Although we agree that the harmful impact of oil imports on the national security is well established by prior findings under § 232(b), and further action under that section is not likely to be questioned on this basis, we note that the Act does specifically state that the Secretary shall make "an appropriate investigation, in the course of which he shall seek information and advice from, and shall consult with, the Secretary of Defense and other appropriate officers of the United States. . . ." This procedure was followed prior to President Ford's

---

[5] The department assigned to implement the proclamation would be required to consider the possible application of the National Environmental Policy Act, 42 U.S C. §§ 4321–4361 (Supp. IV 1980) (NEPA) to its actions taken in connection with the import fee program. Based upon our preliminary review, we do not believe that the Secretary, in connection with an investigation and recommendation concerning the necessity for a § 232(b) proclamation, or the President, in connection with his issuance of such a proclamation, would be required by NEPA to file an environmental impact statement.

[6] Regulations issued by the Secretary of Commerce after § 232(b) functions were transferred to him, *see* Note 1, *supra*, contain similar discretion for him to dispense with public participation in the conduct of any § 232 investigation conducted 15 C F R. Part 359 (1981 ed.).

imposition of import fees in Proclamation No. 4341 in 1975 and was recounted in the Supreme Court's opinion in *Algonquin* upholding the President's power to impose the fees. Because this approach has survived court challenge and because it would be permissible and not unreasonably difficult or time-consuming to follow the current, applicable Department of Commerce regulations, 15 C.F.R., Part 359 (1981), we recommend that that Department conduct a new, nonpublic investigation to support any proclamation imposing new import fees. Such an investigation, like the one completed in only ten days in 1975, would, we believe, withstand a legal challenge. Based on the results of such an investigation and the report of the Secretary, the President could reasonably make the requisite findings[7] set forth in §§ 232(b) and (c) of the Act and issue a proclamation imposing import fees.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[7] Because of the cautionary note in the *Algonquin* decision and the district court's holding in *Independent Gasoline Marketers Council, Inc. v Duncan,* we would counsel against the President's premising the issuance of a proclamation on a finding that the import fee would provide revenues which could be used for a national security purpose, such as to defray the expense of filling the Strategic Petroleum Reserve This might be misconstrued as the primary purpose for the proclamation, thus subjecting it to challenge on the ground that it was not truly intended by the President "to adjust the *imports* of [petroleum]    . so that such *imports* will not threaten to impair the national security  . ," as required by § 232(b) (emphasis added) Nevertheless, we recognize that the import fee would generate revenues, and we see no impediment to Congress' authorizing the Executive to apply these additional revenues for such a national security purpose.