# Presidential Authority to Adjust Ferroalloy Imports Under § 232(b) of the Trade Expansion Act of 1962

The President has authority to upgrade two ferroalloys currently held in the National Defense Stockpile, and remove one of these ferroalloys from the Generalized System of Preferences established under the Trade Act of 1974, in response to a "national security" finding under § 232(b) of the Trade Expansion Act of 1962, § 19 U.S.C. § 1862(b). This authority stems not from § 232(b) itself, but from separate and independent statutory schemes.

The above-described actions will satisfy the President's obligation under § 232(b) to take such actions as are necessary to "adjust imports" in responding to a threat to the national security.

October 5, 1982

## MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked this Office to provide you with our views regarding four questions concerning the scope and flexibility of the President's authority to adjust imports under § 232(b) of the Trade Expansion Act of 1962, as amended, 19 U.S.C. § 1862. The questions relate to a range of actions the President might take in response to a "Report" he has received from the Secretary of Commerce which contains a finding by the Secretary that high carbon ferrochromium and high carbon ferromanganese are "being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security. . . ." 19 U.S.C. § 1862(b).

The Report, in connection with this finding, recommends to the President: (i) the upgrading to high carbon ferrochromium and high carbon ferromanganese of chromite and manganese ores currently held in the National Defense Stockpile (NDS), an action to be taken pursuant to the Strategic and Critical Materials Stock Piling Revision Act of 1979, 50 U.S.C. §§ 98–98h–4 (Stock Piling Act), and (ii) removal of high carbon ferromanganese from the Generalized System of Preferences (GSP) established under Title V of the Trade Act of 1974, 19 U.S.C. §§ 2461–2465 (1974 Trade Act). We conclude that the President may exercise his authority under the Stock Piling Act to upgrade the two ores and his authority under the 1974 Trade Act to withdraw GSP status of high carbon ferrochromium in response to a "national security" finding under 19 U.S.C. § 1862(b). We are also of the view that such actions would satisfy the statutory requirement that the President, unless he rejects the Secretary's finding, "shall take such action, and for such time, as he deems necessary to adjust the imports of such [ferroalloy]

557

. . . so that such imports will not threaten to impair the national security. . . ."
19 U.S.C. § 1862(b).

Our responses to your specific questions are as follows:

*Question 1.* Whether upgrading ores in the National Defense Stockpile (NDS) into ferroalloys would be "action to adjust imports" *authorized by* § 232 of the Trade Expansion Act of 1962.

We are not aware that any department has argued that upgrading the ores in the NDS is, in this particular instance, "action to adjust imports" *authorized by* § 232. To the contrary, the Commerce Department Report recommends that the stockpiling action be taken pursuant to the Stock Piling Act. Although this Department has interpreted the President's authority under § 232 extremely broadly in the past, *see* 43 Op. Att'y Gen. No. 3 (Jan. 14, 1975), and the legislative history mentions stockpiling as an appropriate action,[1] we do not believe that upgrading the stockpile is an action which would be authorized by § 232 standing alone. In light of the cautionary language in *Federal Energy Administration* v. *Algonquin SNG, Inc.,* 426 U.S. 548, 571 (1976), which warned that "our conclusion here, fully supported by the relevant legislative history, that the imposition of a license fee is authorized by § 232(b) in no way compels the further conclusion that *any* action the President might take, as long as it has even a remote impact on imports, is also so authorized," we see no reason to reach out unnecessarily to answer question 1 affirmatively since there is clear authority for the stockpiling action under separate statutory authority.

*Question 2.* If, by action under separate authority, the President were to implement the two remedial actions (stockpiling and GSP removal) recommended in the § 232 Commerce Report, would the requirement of § 232—that action "to adjust imports" be taken—be satisfied?

As a preliminary matter, we would note that this question need not be resolved if the President were to refrain at this time from accepting or rejecting the "national security" finding made in the Commerce Report. That is, the President could take the two recommended remedial actions under independent authority established in the Stock Piling Act and the 1974 Trade Act and simply postpone, in light of changed circumstances that would exist at that point, his determination whether the articles are being imported into the United States in such a manner as to threaten to impair the national security.

Should the President, however, determine to affirm the finding of the Secretary, we believe the requirements of § 232 would be satisfied. The only statutory requirement imposed on the President by § 1862(b) is that he "shall take such action, and for such time, as he deems necessary to adjust the imports of such

---

[1] *See* 101 Cong. Rec. 5588 (1955) ("[they] will have at their command the entire scope of tariffs, quotas, restrictions, stockpiling, and any other variation of these programs") (remarks of Sen. Bennett); 101 Cong. Rec. 5299 (1955) ("It grants to the President authority to take whatever action he deems necessary to adjust imports. . . He may use tariffs, quotas, import taxes, or other methods of import restrictions.") (remarks of Sen Milliken); S. Rep. No. 232, 84th Cong., 1st Sess. 4 (1955) (President to have the authority to take "whatever action is necessary to adjust imports").

article . . . so that such imports will not threaten to impair the national security. . . ." As we understand the facts, by upgrading the NDS many domestic producers of high carbon ferrochromium and ferromanganese who might otherwise go out of business will remain economically viable for the ten-year period during which the upgrading would occur. Absent such a remedial measure, the failure of these domestic producers would leave the country dependent on imports of strategically critical ferroalloys. Necessarily then, the President's action will have the result of adjusting imports; the nation will rely less on imports of ferroalloys if some domestic production continues. In addition, the effect of removing high carbon ferromanganese from GSP treatment would be analogous to the imposition of tariffs or fees, which are accepted remedies for purposes of § 232. *See FEA* v. *Algonquin SNG, Inc.,* 426 U.S. at 571. Presumably, raising the price of imports of high carbon ferromanganese would increase the demand for the domestically produced article and thus "adjust imports" within the meaning of § 232.

The language, legislative history, and purpose of § 232 indicate that the proposed remedial actions would satisfy the President's obligations under § 232(b). As the Supreme Court noted in *FEA* v. *Algonquin SNG, Inc.,* 426 U.S. at 561:

> In authorizing the President to "take such action and for such time, as he deems necessary to adjust the import of [an] article and its derivatives," *the language of § 232(b) seems clearly to grant him a measure of discretion in determining the method to be used to adjust imports.* (Emphasis added.)

Nor has this Department ever questioned that the language in § 232 grants the President "the broadest flexibility" in selecting actions "to adjust imports." 43 Op. Att'y Gen. No. 3, at 5.

Section 232 of the Trade Expansion Act also instructs the President to:

> give consideration to domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, . . . [as well as to] take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, . . . loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports . . . in determining whether such weakening of our internal economy may impair the national security.

19 U.S.C. § 1862(c). Because the statutory language specifically indicates that maintaining the viability of domestic industries perceived to be critical to the national security was a major purpose of § 232, we believe that the proposed remedial actions—which would achieve the statutory purpose of preserving domestic production of articles important to the national security—would "adjust imports" within the meaning of § 232.

The legislative history of § 232(b) and its predecessors[2] similarly indicates that Congress wanted the President both to address himself to the effects of imports on domestic industries deemed critical to the national security[3] and to have broad powers to preserve domestic production needed for national defense requirements. Indeed, Representative Cooper, the floor manager of the bill containing § 232(b), illustrated the meaning of that provision with an example analogous to the present situation. He noted that the conference report "emphasized that if the President sees fit to stockpile critical materials under any other law, that act may be taken wholly aside from the authority contained in this amendment [final version of § 232(b)]. Conversely, action under the new provision may be taken wholly aside from the authority contained in any other law." 101 Cong. Rec. 8160, citing H.R. Rep. No. 745, 84th Cong., 1st Sess. 7 (1955).

Representative Cooper further explained:

> This means that if the President should institute a stockpiling program which would successfully preserve the essential domestic producing facilities in a sound condition and the threat to the national security from increasing imports would thereby be eliminated, there would be no necessity for limiting imports. The President would not only retain flexibility as to the particular measure which he deems appropriate to take, but, having taken an action, he would retain flexibility with respect to the continuation, modification, or suspension of any decision that had been made.

101 Cong. Rec. 8160–61.[4]

As noted above, Congress made no attempt to restrict the options available to the President to adjust imports in response to a national security finding under § 232. See n.1 supra. (President authorized to take whatever action he deems necessary.) See also H.R. Rep. No. 1761, 85th Cong., 2d Sess. 13 (1958) (statute provides "those best able to judge national security needs . . . [with] a way of taking *whatever action is needed* to avoid a threat to the national security through imports") (emphasis added). We therefore conclude, based on the language and legislative history of § 232, that stockpiling and removing the GSP status of the relevant ferroalloys under independent statutory authorities are sufficient actions "to adjust imports" in response to a national security finding by the Secretary of Commerce.

Finally, we do not believe that either *FEA* v. *Algonquin SNG, Inc.*, 426 U.S. 548, or *Independent Gasoline Marketers Council* v. *Duncan*, 492 F. Supp. 614

---

[2] Section 232(b) was originally enacted by Congress as § 7 of the Trade Agreement Extension Act of 1955, Pub. L. No. 84–86, 69 Stat. 162, 166, and amended by § 8 of the Trade Agreement Extension Act of 1958, Pub. L. No. 85–686, 72 Stat 673, 678.

[3] In directing the President to consider the domestic effects of imports, § 232 contrasts with other statutes which delegate powers to the President to deal with imports but instruct him to focus primarily on international concerns. See, e.g., 19 U.S.C. § 2132 (correcting balance-of-payments disequilibria), 50 U.S.C. §§ 1701–1706 (Supp V 1981) (International Emergency Economic Powers Act).

[4] See also Hearings on Trade Agreements Extension (H R. 1), before the House Comm. on Ways and Means, 84th Cong., 1st Sess. (1955); Hearings on Trade Agreements Extension (H.R. 1), before the Senate Comm. on Finance, 84th Cong , 1st Sess. (1955)

(D.D.C. 1980), establishes that these actions would be a legally insufficient response to the finding. In upholding the President's authority to impose a license fee system under § 232(b), the Court's opinion in *Algonquin* repeatedly cited to expressions from Congress and the Executive Branch reflecting their understanding of the broad scope of authority granted to the President by the language of § 232(b). *See* 426 U.S. at 564–70. The Court's final caveat that neither its holding nor the legislative history "compels the further conclusion that *any* action the President might take, as long as it has even a remote impact on imports, is also so authorized," 426 U.S. at 571, is simply not applicable in the present instance because we do not deal here with the coercive regulation of private enterprise that was an underlying concern in the *Algonquin* case.

The present actions are also similarly distinguishable from the Petroleum Import Adjustment Program (PIAP) that was created in response to a national security finding concerning oil imports, and was successfully challenged in *Independent Gasoline Marketers Council* v. *Duncan*, 492 F. Supp. 614. The PIAP license-fee system was a demand-side disincentive, ultimately designed to fall on consumers of gasoline rather than users of home heating oil. It imposed a gasoline conservation fee on refiners of *both* domestic and imported crude oil. The court determined that the PIAP system was structured to lower demand for oil generally rather than demand for imports in particular. The court explained the remoteness of the program's effect on imports as follows:

> First, the quantitative impact of the program on import levels will admittedly be slight. Second, the program imposes broad controls on domestic goods to achieve that slight impact. Third, Congress has thus far denied the President authority to reduce gasoline consumption through a gasoline conservation levy. PIAP is an attempt to circumvent that stumbling block in the guise of an import control measure. TEA alone does not sanction this attempt to exercise authority that has been deliberately withheld from the President by the Congress.

492 F. Supp. at 618. The PIAP system clearly was the type of presidential action that the Supreme Court had warned was not authorized by § 232 in the *Algonquin* case.

In contrast to the PIAP system, the proposed remedial actions for ferroalloys in no way penalize domestic industries; rather, the stockpiling action aids them. More importantly, these actions do not constitute coercive regulation taken pursuant to the Act. The removal of GSP status for ferromanganese also discriminates between imports and domestic goods, in conformity with the requirements of § 232. Further, the President would not be relying on § 232 to accomplish indirectly an action that Congress had not authorized him to undertake directly. Accordingly, we conclude that the proposed remedial actions would satisfy the requirements of § 232.

*Question 3*. If, by independent action and under separate authority, the President implements the two remedial actions (stockpiling and GSP removal) recom-

561

mended in the § 232 Commerce Report, can the President then either take no action on the report at this point *or* return the report to Commerce for further consideration in light of the remedies taken? What effect would such action have on the other 11 ferroalloys for which there were no positive findings?

Section 232(b), as explained above, requires the President either: (1) to take such action, and for such time, as he deems necessary to adjust imports so as to remove the threat to the national security; or (2) to reject the finding of the Secretary of Commerce that imports threaten to impair the national security. 19 U.S.C. § 1862(b). No time frame constrains the President. Moreover, as this Department has previously indicated, the statutory language and relevant legislative history contemplate a continuing course of action, with the possibility of future modifications. 43 Op. Att'y Gen. No. 3, at 2–3 (Jan. 14, 1975).[5] As noted in a Commerce Department memorandum, the constant monitoring contemplated by § 232 encompasses not only a review of factual circumstances to determine whether a particular remedy is effective, but also a review to determine whether the initial finding of a threat to the national security remains valid. Memorandum to H.P. Goldfield, Associate Counsel to the President, from Irving P. Margulies, Deputy General Counsel, Re: Ferroalloy Investigation at 2 (Sept. 8, 1982). Thus, we see no reason why the President may not retain the Report for further consideration in light of the actions he will have taken under independent statutory authority. Similarly, we see no reason why he may not return the Report to the Commerce Department for further evaluation given the changed circumstances resulting from the actions he will have undertaken.

You have further inquired whether either of these actions would affect the 11 ferroalloys for which no positive national security finding was made. The only potential effect we have been able to identify is whether the President or Secretary of Commerce would be required to publish the Report of the investigation and findings. Section 232(d) requires that:

> A report shall be made and published upon the disposition of each request, application, or motion under subsection (b) of this section. The Secretary shall publish procedural regulations to give effect to the authority conferred on him by subsection (b) of this section.

The Commerce Department regulations promulgated thereunder state that:

> The report, excluding the sections containing national security classified and business confidential information and material, shall be published in the Federal Register upon the disposition of each request, application, or motion made pursuant to [§ 232].

---

[5] Representative Cooper, floor manager of the bill which adopted § 232(b), commented·

 The President would not only retain flexibility as to the particular measure which he deems appropriate to take, but, having taken an action, he would retain flexibility with respect to the continuation, modification, or suspension of any decision that had been made.

101 Cong. Rec 8160–61 (1955). The conference report on the bill also stated with reference to § 232(b) that "[i]t is . . the understanding of all the conferees that the authority granted to the President under this provision is a continuing authority. . ." H.R. Rep. No. 745, 84th Cong., 1st Sess 7 (1955)

15 C.F.R. § 359.10(c). The President's decision either to retain the Report for further study or to return it to the Commerce Department for further evaluation would not constitute a final disposition of the § 232 application by the Ferroalloys Association. Consequently, no publication requirement would be triggered.

*Question 4.* Whether GSP eligibility may be withdrawn under § 232 of the Trade Expansion Act, without the President (i) considering the factors required in § 504(a) of the Trade Act of 1974, and (ii) issuing an executive order overriding the previous executive order under which GSP status was granted to the product?

We are unaware that any department presently contends that GSP eligibility should be withdrawn under § 232 of the Trade Expansion Act. The consensus has been that withdrawal of duty-free treatment for high carbon ferromanganese should be implemented under the authority of § 504 of the Trade Act of 1974, 19 U.S.C. § 2464. Two reasons supported this consensus. First, § 503 of the Trade Act of 1974 provides that whenever an article is the subject of any action proclaimed under § 232, that article will not be eligible for GSP status. 19 U.S.C. § 2463(c)(2). We understand that there was a policy disagreement as to whether removal of GSP status was therefore a necessary concomitant of other import-adjusting action under § 232, or whether removal of GSP status alone would suffice to adjust imports under § 232. Second, even if withdrawal of GSP status alone were action authorized by § 232, this determination would not establish that the President had acted solely under the authority of § 232 with respect to high carbon ferrochromium, which has no GSP status. One would still have to rely on the proposition that action to "adjust imports" as contemplated by § 232 could be taken under separate authority were the President to stockpile high carbon ferrochromium under the Stock Piling Act.

Assuming that withdrawal of GSP status can be demonstrated to adjust imports sufficiently directly so as to constitute action under § 232, we do not believe the President is required to consider the factors mentioned in § 504(a) of the Trade Act of 1974. (The factors are set forth in 19 U.S.C. §§ 2461, 2462(c).) Those factors, which focus on economic interactions between developed and developing countries, are relevant to withdrawal of GSP treatment under the Trade Act of 1974; they have no bearing on actions taken under § 232 of the Trade Expansion Act to address threats to the national security. We are of the view, however, that should the President remove GSP treatment of ferromanganese, he would be required to issue an executive order overriding the earlier executive order, issued pursuant to 19 U.S.C. § 2463(b), which had designated high carbon ferromanganese to be eligible for GSP treatment.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
